UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ASSOCIATED BUILDERS AND CONTRACTORS OF CALIFORNIA COOPERATION COMMITTEE, INC. and INTERPIPE CONTRACTING, INC., | Case No.:  3:16-cv-02247-BEN-NLS |
| | **ORDER:** |
| Plaintiffs, | |
| v. | **(1) GRANTING DEFENDANT BECERRA'S MOTION TO DISMISS [ECF No. 6];** |
| XAVIER BECERRA in his official capacity as Attorney General of the State of California; CHRISTINE BAKER in her official capacity as Director of the California Department of Industrial Relations; and JULIE SU in her official capacity as California Labor Commissioner, Division of Labor Standards Enforcement, | **(2) DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION [ECF No. 11]; and** |
| | **(3) GRANTING DEFENDANT SU'S MOTION TO DISMISS AND DEFENDANT BAKER'S MOTION FOR JUDGMENT ON THE PLEADINGS [ECF No. 17]** |
| Defendants. | |

This case concerns the constitutionality of California Senate Bill ("SB") 954, a law that amends part of California's prevailing wage law.  Before passage of the law, both unionized and non-union employers were entitled to the same benefit.  However, with the enactment of SB 954, the Legislature of the State of California made a political decision to take away that benefit from non-union employers.  Unionized employers retain the

benefit.  The fight over the constitutionality of SB 954 continues the ongoing fight between unions and open shops in this state.

Unlike the California Legislature, this Court is not a political institution.  It does not act politically or personally.  It is a court of law bound by prior precedent.  As such, upon consideration of the issues and controlling authority, the Court is compelled to grant Defendants' motions and dismiss Plaintiffs' complaint.

## BACKGROUND

This case involves California's prevailing wage law.  *See* Cal. Labor Code §§ 1770 *et seq.*  That law requires contractors on public works construction projects to pay the general prevailing rate of per diem wages for work of a similar character in the locality in which the work is performed.  *Id.* § 1771.  The Director of the California Department of Industrial Relations ("California DIR") determines the general prevailing rate of per diem wages.  Under the law, the "general prevailing rate of per diem wages includes . . . [t]he basic hourly wage rate . . . [and] employer payments," *i.e.*, benefits.  *Id.* § 1773.9.  In other words, employers can satisfy the prevailing wage by either paying all cash wages or a mix of cash wages and benefits that add up to the prevailing wage rate.  California Labor Code section 1773.1 defines what "employer payments" are included in per diem wages.  "Employer payments are a credit against the obligation to pay the general prevailing rate of per diem wages." § 1773.1(c).  SB 954 amends the definition of employer payments under section 1773.1.

Under section 1173.1, per diem wages include employer payments for traditional benefits like "health and welfare," "pension," and "vacation."  Previously, section 1773.1 also provided that employer payments include:

(8) Industry advancement and collective bargaining agreements administrative fees, provided that these payments are required under a collective bargaining agreement pertaining to the particular craft, classification, or type of work within the locality or the nearest labor market area at issue.

(9) Other purposes similar to those specified in paragraphs (1) to (8), inclusive.

*Id.* § 1773.1 (citing law before SB 954 became effective).

Thus, an employer making payments to an industry advancement fund could receive prevailing wage credit under § 1773.1(a)(8) if the payment was required under a collective bargaining agreement ("CBA"). An employer making a similar payment to an industry advancement fund, but which was not required by a collective bargaining agreement, could receive prevailing wage credit under § 1773.1(a)(9). This arrangement changed on January 1, 2017.

Plaintiff Associated Builders & Contractors of California Cooperation Committee, Inc. ("ABC-CCC") is a § 501(c)(6) tax exempt trade association representing the interests of open shop employers in the building and construction industry. (Compl. ¶ 4.) It is recognized by the California DIR as an industry advancement fund. (*Id.*) It received employer payments that qualified for credit under section 1773.1(a)(9). (*Id.* ¶ 14.) Plaintiff Interpipe Contracting, Inc. ("Interpipe") is a California contractor that "has made prevailing wage payments to ABC-CCC on a regular basis in the past, and has received prevailing wage credit under California Labor Code section § 1773.1(a)(9) for those payments." (*Id.* ¶ 5.)

Effective January 1, 2017, SB 954[1] amends what qualifies as "employer payments" under subsections (8) and (9) as follows:

> (8) Industry advancement and collective bargaining agreements administrative fees, provided that these payments are made pursuant to a collective bargaining agreement to which the employer is obligated.

> (9) Other purposes similar to those specified in paragraphs (1) to (5), inclusive; or other purposes similar to those specified in paragraphs (6) to (8), inclusive, if the payments are made pursuant to a collective bargaining agreement to which the employer is obligated.

---

[1] SB 954 was sponsored by the State Building and Construction Trades Council of California ("Building Trades Council"). (Pls. Mot., Broyles Decl. ¶ 4.) According to Plaintiffs, the Building Trades Council engages in pro-union advocacy. (Pls. Mot. at 3; Broyles Decl. ¶ 8; Dayton Decl. ¶¶ 9-10.)

(SB 954, Compl. Ex. A.)  Therefore, according to Plaintiffs, under the new law, employers making payments to industry advancement funds will not receive prevailing wage credit unless the payment is required by a collective bargaining agreement.

Plaintiffs allege that the "loss of employer payment credits under SB 954 will cause Interpipe and other open shop employers to reduce or eliminate their payments to industry advancement funds like ABC-CCC." (Compl. ¶ 15.)  ABC-CCC alleges that it will "suffer severe financial harm in the form of lost revenues as a result of reduced employer payments resulting from the loss of" the credit, and those lost revenues will force ABC-CCC to "curtail or discontinue its advocacy on behalf of open shop employers." (*Id.* ¶ 18.)  And Interpipe will be harmed because it "will lose some or all of the industry advocacy and financial assistance previously provided by ABC-CCC." (*Id.* ¶ 19.)

Plaintiffs' complaint seeks declaratory and injunctive relief on three claims for relief:  (1) a claim that SB 954 is preempted by the National Labor Relations Act ("NLRA") under the Supremacy Clause; (2) a claim that SB 954 violates ABC-CCC's First Amendment speech rights; and (3) a claim that SB 954 violates ABC-CCC's equal protection rights.  (Compl. ¶¶ 22-34.)  They have sued Xavier Becerra, in his official capacity as Attorney General of the State of California;[2] Christine Baker, in her official capacity as Director of the California DIR; and Julie Su, in her official capacity as California Labor Commissioner.  Becerra is represented separately from Baker and Su.

Becerra and Su have moved to dismiss the complaint and Baker has moved for judgment on the pleadings.  (Becerra Mot., ECF No. 6; Su & Baker Mot., ECF No. 17.)  Plaintiffs have moved for a preliminary injunction to prevent SB 954 from going into

---

[2] When Plaintiffs originally filed suit, Kamala Harris was California's Attorney General. Since that time, Harris has been elected and sworn in to the United States Senate and Xavier Becerra has been sworn in as the 33rd Attorney General of the State of California. Under Federal Rule of Civil Procedure 25(d), a public officer's successor is automatically substituted as a party.  The Court therefore substitutes Becerra for Harris.

effect on January 1, 2017.  (Pls. Mot., ECF No. 11.)  The Court held a hearing on Becerra's and Plaintiffs' motions on December 14, 2016.  The Court takes Su and Baker's motion under submission without oral argument, pursuant to Civil Local Rule 7.1.d.1.

## LEGAL STANDARDS

### I.    Motions to Dismiss and for Judgment on the Pleadings

"[A] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009).  "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"  *Zixiang Li v. Kerry*, 710 F.3d 995, 999 (9th Cir. 2013) (quoting *Iqbal*, 556 U.S. at 678).  When considering a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss,[3] the court must "accept as true facts alleged and draw inferences from them in the light most favorable to the plaintiff."  *Stacy v. Rederite Otto Danielsen*, 609 F.3d 1033, 1035 (9th Cir. 2010) (citing *Barker v. Riverside Cnty. Office of Educ.*, 584 F.3d 821, 824 (9th Cir. 2009)).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Iqbal*, 556 U.S. at 678.  Dismissal may be based on either the lack of a cognizable legal theory or on the absence of sufficient facts alleged under a cognizable legal theory.  *In re Tracht Gut, LLC*, 836 F.3d 1146, 1151 (9th Cir. 2016) (internal citations omitted).  The same standard applies to motions for judgment on the pleadings under Federal Rule of Civil Procedure 12(c).[4]

---

[3] Defendants Becerra and Su bring motions to dismiss under Rule 12(b)(6).

[4] Defendant Baker brings a motion for judgment on the pleadings under Rule 12(c). Plaintiffs contend that Baker's motion should be denied as premature because the pleadings have not closed.  Rule 12(c) permits a motion for judgment on the pleadings "after the pleadings are closed," Fed. R. Civ. P. 12(c), and generally this means after all defendants have filed an answer.  *See Noel v. Hall*, No. CV 99-649, 2005 WL 2007876, at *1 (D. Or. Aug. 16, 2005).  Only Defendant Baker has filed an answer.  However, "courts have exercised their discretion to permit a motion on the pleadings before all

*Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 n.4 (9th Cir. 2011).

Documents attached to or incorporated by reference in the complaint or matters of judicial notice may be properly considered under Rule 12(b)(6) and Rule 12(c) without converting the motion into one for summary judgment. *See Fortuna Enters., L.P. v. City of Los Angeles*, 673 F. Supp. 2d 1000, 1004 (C.D. Cal. 2008); *Rose v. Chase Manhattan Bank USA,* 396 F. Supp. 2d 1116, 1119 (C.D. Cal. 2005). Here, SB 954 is attached as an exhibit to Plaintiffs' complaint and its terms are uncontested. Defendants request that the Court take judicial notice of the legislative history of SB 954 and a copy of the General Prevailing Wage Determination made by the California DIR. These documents are available on government websites. Under Rule 201 of the Federal Rules of Evidence, a court may take judicial notice of the legislative history of state statutes and government documents available on reliable sources on the Internet. *Louis v. McCormick & Schmick Rest. Corp.*, 460 F. Supp. 2d 1153, 1155 n.4 (C.D. Cal. 2006) (citing cases); *U.S. ex rel. Dingle v. BioPort Corp.*, 270 F. Supp. 2d 968, 972 (W.D. Mich. 2003). Accordingly, the Court takes judicial notice of these documents.

## II.   Motion for a Preliminary Injunction

"A preliminary injunction is an extraordinary and drastic remedy." *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1124 (9th Cir. 2014) (quoting *Munaf v. Geren,* 553 U.S. 674, 689 (2008)). To obtain a preliminary injunction, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of hardships tips in his favor,

_____

defendants have filed an answer where no prejudice to any party would result." *Id.* (internal citations omitted). Because Plaintiffs bring the same purely legal claims against all Defendants, and because the same questions are before the Court in Defendants Becerra's and Su's motions as in Defendant Baker's motion, no prejudice would result from considering Baker's Rule 12(c) motion now. Accordingly, the Court exercises its discretion to rule on Baker's motion.

1    and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*,

2    555 U.S. 7, 20 (2008).  The *Winter* factors are considered in conjunction with the Ninth

3    Circuit's "sliding scale" approach, which provides that "the elements of the preliminary

4    injunction test are balanced, so that a stronger showing of one element may offset a

5    weaker showing of another." *Vanguard Outdoor, LLC v. City of Los Angeles*, 648 F.3d

6    737, 739 (9th Cir. 2011).

7                                    **DISCUSSION**

8    **I.    Ripeness and Standing**

9            The Court asked the parties to address why the case was ripe for adjudication and

10   why Plaintiff ABC-CCC has standing.  After hearing the parties' arguments at the

11   hearing, the Court finds that the case is ripe but that ABC-CCC does not have standing to

12   bring its equal protection claim.

13           The ripeness doctrine seeks to separate matters that are premature for judicial review

14   because the injury is speculative and may never occur, from those cases that are

15   appropriate for federal court action.  E. Chemerinsky, Federal Jurisdiction § 2.4.1 (4th

16   ed.).  The Court's "role is neither to issue advisory opinions nor to declare rights in

17   hypothetical cases, but to adjudicate live cases or controversies consistent with the

18   powers granted the judiciary in Article III of the Constitution." *Thomas v. Anchorage*

19   *Equal Rights Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 2000).

20           Ripeness has a constitutional and prudential component.  *Id.* at 1138.  Under the

21   constitutional component, the court "considers whether the plaintiffs face 'a realistic

22   danger of sustaining a direct injury as a result of the statute's operation or enforcement,'

23   or whether the alleged injury is too 'imaginary' or 'speculative' to support jurisdiction."

24   *Id.* at 1139.[5]  The constitutional component of ripeness is the same or similar to the injury

25

26   _____

27   [5] *Thomas* articulated three factors to evaluate the constitutional component of a pre-
     enforcement challenge.  Those factors are (1) whether the plaintiffs have articulated a
28   concrete plan to violate the law in question, (2) whether the prosecuting authorities have

                                              7

in fact prong of standing.  *See id.*  Prudential ripeness involves "two overarching considerations:  the fitness of the issues for judicial review and the hardship to the parties of withholding court consideration."  *Id.* at 1141.

Here, the Court is satisfied that this case is ripe for review.  The constitutional components of ripeness are met.  First, Interpipe has been injured as a result of SB 954 because, due to SB 954, ABC-CCC had to refuse Interpipe financial assistance (*i.e.*, ABC-CCC's advocacy resources) to oppose a particular bond measure.  (Pls. Mot., Smith Decl. ¶ 8.)  With respect to ABC-CCC, at the hearing, Plaintiffs contended that ABC-CCC would incur financial damage once the statute went into effect and that ABC-CCC's speech rights would be chilled.  Plaintiffs pointed to evidence submitted in support of their motion for a preliminary injunction to sustain ABC-CCC's claim of economic and non-economic injuries.  In those declarations and attachments, eleven employers contend

---

communicated a specific warning or threat to initiate proceedings, and (3) the history of past prosecution or enforcement under the challenged statute.  *Id.* at 1139.

Several reasons compel this Court not to apply the *Thomas* factors strictly.  First, the *Thomas* factors are inapplicable to ABC-CCC.  The Ninth Circuit has found that the "familiar pre-enforcement challenge analysis articulated in *Thomas*" does not apply when the plaintiffs "are not the target of enforcement."  *San Luis & Delta-Mendota Water Authority v. Salazar*, 638 F.3d 1163, 1173 (9th Cir. 2011).  Here, while Interpipe would be the target of any enforcement action for violating SB 954, ABC-CCC would not be.  When the plaintiff is not the target of enforcement, "the consideration of 'whether the plaintiff[] ha[s] articulated a concrete plan to violate the law in question' has little meaning."  *Id.*  Further, the last factor—the history of past enforcement—is inapplicable to both parties because the statute is new.  *Wolfson v. Brammer*, 616 F.3d 1045, 1060 (9th Cir. 2010).  Next, as discussed in the text, the statute is now in effect and the Plaintiffs have sufficiently alleged injury as a result of its operation.  Finally, to avoid chilling a plaintiff's speech in cases with First Amendment implications, such as this case, courts apply the requirements of ripeness less stringently when "the plaintiff is immediately in danger of sustaining[] a direct injury as a result of [an executive or legislative] action."  *Ala. Right to Life Political Action Committee v. Feldman*, 504 F.3d 840, 851 (9th Cir. 2007) (alterations in original).  As explained in the text, the Court finds that the Plaintiffs satisfy this test.

1    that they will cease making contributions to ABC-CCC as of January 1, 2017 because of

2    the loss of the prevailing wage credit.  (*Id.*, Smith Decl. ¶¶ 6-7; Loudon Decl. ¶ 20, Ex.

3    B.)  The statute has now gone into effect and Court has no reason to doubt that Plaintiffs'

4    prior averments have changed.  Therefore, ABC-CCC has sufficiently alleged an injury.

5    Moreover, Defendants conceded at the hearing that they intend to enforce SB 954.  (Hr'g

6    Tr. at 28, 32, 35, ECF No. 36.)  Thus, based on the parties' representations, the Court

7    finds that Plaintiffs face a realistic danger of sustaining a direct injury as a result of SB

8    954.

9        The prudential component to ripeness is also satisfied.  First, "the challenge is fit for

10   judicial review because further factual development would not 'significantly advance [the

11   Court's] ability to deal with the legal issues presented.'"  *San Luis & Delta-Mendota*

12   *Water Authority*, 638 F.3d at 1173 (internal citations omitted).  Second, Plaintiffs would

13   suffer hardship if the Court withholds consideration because the statute is now in effect,

14   depriving ABC-CCC of payments it would have otherwise received through employer

15   prevailing wage credits.  Therefore, the case is ripe for judicial determination.

16       However, ABC-CCC does not have standing to assert an equal protection claim on

17   behalf of itself.[6]  Standing is an essential component of Article III's case or controversy

18   requirement.  One of the three irreducible standing requirements is that the plaintiff must

19   have suffered an injury in fact.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61

20

21

22   [6] An association can have standing to bring suit on behalf of its members.  *See Associated*
     *Builders & Contractors, Golden Gate Chapter Inc. v. Baca*, 769 F. Supp. 1537, 1541

23   (N.D. Cal. 1991).  That is, an association can raise the equal protection rights of its

24   members.  But the complaint does not plead associational standing on behalf of ABC-
     CCC's members.  Rather, it is clear that ABC-CCC sues on its own behalf to challenge

25   violations of its own rights.  (*See* Compl. ¶¶ 31-34 (equal protection claim captioned "SB

26   954 Violates ABC-CCC's Equal Protection Rights"); Pls. Opp'n to Becerra Mot. at 12,
     ECF No. 12 (stating that the equal protection claim "is brought by Plaintiff ABC-CCC as

27   an industry advancement fund.  It is not brought by Plaintiff Interpipe as an employer.");
     Pls. Opp'n to Su & Baker Mot. at 16, ECF No. 34 (emphasizing that ABC-CCC brings

28   equal protection claim "on behalf of itself."))

(1992).  On this requirement, "[t]he Court requires that even if a government actor discriminates . . . , the resulting injury 'accords a basis for standing only to those persons who are personally denied equal treatment.'"  *Carroll v. Nakatani*, 342 F.3d 934, 940 (9th Cir. 2003) (internal citations omitted).  ABC-CCC sues for violations of its own equal protection rights, but SB 954 does not discriminate against ABC-CCC—if it does discriminate, it discriminates against employers not subject to CBAs, like Interpipe.  The legal requirements changed by SB 954 are directed to employers, and any penalties for noncompliance will be assessed against employers.  Thus, ABC-CCC lacks standing to pursue an equal protection claim on its own behalf.[7]  Accordingly, ABC-CCC's equal protection claim is **DISMISSED.**

## II.   Analysis of the Motions to Dismiss

Plaintiffs bring a facial challenge to the constitutionality of SB 954 because they seek a declaration that SB 954 is unconstitutional under any circumstance.  *See Am. Hotel & Lodging Ass'n v. City of Los Angeles*, 119 F. Supp. 3d 1177, 1194 (C.D. Cal. May 13, 2015) ("Here, the Plaintiffs seek an order enjoining the City from implementing and enforcing the Wage Ordinance under any circumstance, and therefore they indisputably assert a facial challenge against the Wage Ordinance."), *aff'd*, 834 F.3d 958 (9th Cir. 2016).  Therefore, "there is no need for further development of the facts" and "this case is capable of resolution at the motion to dismiss stage."  *Fortuna Enters.*, 673 F. Supp. 2d at 1003 (granting motion to dismiss and finding wage ordinance not preempted by federal labor law and not in violation of equal protection guarantees).

### A. Preemption

Plaintiffs argue that SB 954 is preempted by the NLRA under the Supremacy Clause of the U.S. Constitution.  The NLRA contains no express preemption provision, but the

---

[7] Defendants Su and Baker raised the issue of ABC-CCC's standing to bring the equal protection claim in their motion.  In response, Plaintiffs failed to offer authority to support why ABC-CCC has standing to sue on behalf of itself.

Supreme Court has held that Congress "implicitly mandated two types of preemption . . . to implement federal labor law." *Chamber of Commerce v. Brown*, 554 U.S. 60, 65 (2008). Those two doctrines are known as *Machinists* and *Garmon* preemption. Plaintiffs contend that both doctrines apply. At the hearing, Plaintiffs' counsel stated that *Machinists* preemption is the soul of their complaint. (Hr'g Tr. at 13-14.) Accordingly, this Court will address *Machinists* preemption first.

### 1. *Machinists* Preemption

*Machinists* preemption forbids the National Labor Relations Board ("NLRB") and States from regulating "conduct that Congress intended 'be unregulated because [it should be] left to be controlled by the free play of economic forces.'" *Brown*, 554 U.S. at 65. Generally, a state's attempt to "influence the substantive terms of collective-bargaining agreements" is preempted. *Chamber of Commerce v. Bragdon*, 64 F.3d 497, 500 (9th Cir. 1995). And "the [Supreme] Court has clearly held that state legislation, which interferes with the economic forces that labor or management can employ in reaching agreements, is preempted by the NLRA because of its interference with the bargaining process." *Id.* at 501. The Supreme Court has also found that Congress intended to leave noncoercive speech by unions and employers unregulated. *Brown*, 554 U.S. at 68 (preempting state provision prohibiting employers from using funds "to assist, promote or deter union organizing" because of the "explicit direction from Congress to leave [such] noncoercive speech unregulated").

In contrast, state laws setting minimum labor standards that are unrelated to the processes of collective bargaining or self-organization are not preempted. *See Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 756-57 (1985). Such laws include child labor laws, minimum and other wage laws, and laws affecting occupational health and safety. *Id.* at 756. "Minimum state labor standards affect union and nonunion employees equally, and neither encourage nor discourage the collective bargaining processes that are the subject of the NLRA. Nor do they have any but the most indirect effect on the right

of self-organization established in the Act." *Id.* at 755.  The Ninth Circuit recently explained:

> Minimum labor standards do technically interfere with labor-management relations and may impact labor or management unequally, much in the same way that California's at-will employment may favor employers over employees. Nevertheless, these standards are not preempted, because they do not "regulate the mechanics of labor dispute resolution." *Concerned Home Care Providers, Inc. v. Cuomo*, 783 F.3d 77, 86 (2d Cir. 2015).  Rather, these standards merely provide the "backdrop" for negotiations. *Metropolitan Life*, 471 U.S. at 757, 105 S. Ct. 2380 (internal quotations omitted).  Such standards are a valid exercise of states' police power to protect workers. *Fort Halifax Packing Co. v. Coyne* ("*Fort Halifax*"), 482 U.S. 1, 21–22 (1987).

*Am. Hotel & Lodging Ass'n v. City of Los Angeles*, 834 F.3d 958, 963 (9th Cir. 2016) ("[S]tate action that intrudes on the mechanics of collective bargaining is preempted, but state action that sets the stage for such bargaining is not.").

Moreover, minimum labor standards laws that provide narrowly tailored "opt outs" for employers subject to collective bargaining agreements have been repeatedly upheld. *See Viceroy Gold Corp. v. Aubry*, 75 F.3d 482, 490 (9th Cir. 1996) (California law that allowed only union employers to provide twelve-hour workdays despite general law that required eight-hour days was a narrowly tailored opt-out and was not preempted).  For instance, in *American Hotel & Lodging Association*, the Ninth Circuit held that a city hotel worker wage ordinance that allowed for hotels covered by a collective bargaining agreement to waive the requirements of the ordinance was not preempted.  834 F.3d at 965.  Opt-out provisions are allowed because the protections of the collective bargaining process permit unionized employees to forgo the minimum standard in exchange for another bargained-for benefit.  *See Livadas v. Bradshaw*, 512 U.S. 107, 131-32 (1994); *Viceroy Gold*, 75 F.3d at 489-90.  The Ninth Circuit has explained that opt-outs are not preempted, even though they might "provide[] an incentive to unionize or to remain non-union" and may have a "potential benefit or burden in application." *Id.* at 490.

Plaintiffs argue that SB 954 regulates ABC-CCC's noncoercive labor speech and is therefore preempted under *Machinists*.  Defendants counter that SB 954 establishes a

minimum labor standard, pursuant to the State's valid exercise of its traditional police power, and that it provides a valid "opt out" for employers subject to a collective bargaining agreement.

Plaintiffs contend that classifying SB 954 as a minimum labor standard does not save it from preemption. The Supreme Court has said that "[w]hen a state law establishes a minimal employment standard *not inconsistent* with the general legislative goals of the NLRA," it does not conflict with the purposes of the Act. *Metro. Life*, 471 U.S. at 757 (emphasis added). Plaintiffs argue that because SB 954 targets noncoercive labor speech, it *is inconsistent* with the NLRA under an application of *Chamber of Commerce v. Brown*. In *Brown*, the Supreme Court held that a California statute, which prohibited employers that received state funds from using the funds "to assist, promote, or deter union organizing," was preempted under the *Machinists* doctrine because Congress intended to leave noncoercive speech unregulated when it added section 8(c) to the NLRA.[8] Plaintiffs argue that ABC-CCC's industry advancement advocacy is noncoercive labor speech, which SB 954 regulates by depriving ABC-CCC of employer payments that support that advocacy.

Plaintiffs further argue that the minimum labor standards cases cited by Defendants are inapplicable because none of them involve labor speech. Rather, they assert that the most applicable of those cases is *Chamber of Commerce v. Bragdon*, 64 F.3d 497 (9th

---

[8] Section 8(c) provides:

> The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit.

29 U.S.C. § 158(c).

Cir. 1995).  In *Bragdon*, the Ninth Circuit found that *Machinists* preemption applied to invalidate a Contra Costa County ordinance that required construction employers to pay prevailing wages on certain private industrial construction projects costing over $500,000.  Employers had to agree to pay the state-determined prevailing wage for public works before the County would issue a building permit for the private construction project.  64 F.3d at 499.  The prevailing wage for public works contracts, which the ordinance made applicable to private projects, was determined "by reference to established collective-bargaining agreements within the locality in which the public work [was] to be performed."  *Id.*

Applying the *Machinists* preemption doctrine, the Ninth Circuit rejected the argument that the ordinance functioned as a minimum labor standard.  By imposing on private employers a wage "derived from the combined collective bargaining of third parties," private employers had to pay a wage that was "not the result of the bargaining of those employers and employees actually involved in the selected construction projects in Contra Costa County."  *Id.* at 502.  Furthermore, the manner in which the ordinance operated "would place considerable pressure on the contractor and its employees to revise the[ir] labor agreement to reduce the benefit package and increase the hourly wages in order to remain competitive and obtain the contracts and jobs in Contra Costa County."  *Id.*  Based on these alterations to the "free-play of economic forces," the court found that the ordinance affected "the bargaining process in a much more invasive and detailed fashion than" other state labor standards and was preempted under *Machinists.  Id.*

Plaintiffs contend that SB 954 is similar to the ordinance preempted in *Bragdon* because (1) both are minimum labor standards laws that relate to California's prevailing wage law; (2) both are supported by a Building Trades Council; (3) both are narrowly targeted at employers in the construction industry; (4) both are incompatible with the goals of the NLRA—the *Bragdon* ordinance interfered with the free play of economic forces and SB 954 interferes with the NLRA-protected noncoercive labor speech of

14

1   ABC-CCC; and (5) both have "tenuous" public policy justifications that mask each bill's

2   true objectives.

3         Upon consideration of *Brown*, *Bragdon*, and other cases defining the scope of the

4   *Machinists* preemption doctrine, the Court finds that SB 954 is not subject to *Machinists*

5   preemption.  Plaintiffs read *Brown* too broadly.  In *Brown*, the Supreme Court, drawing

6   on its prior precedent, explained that the addition of section 8(c) manifested

7   "congressional intent to encourage free debate on issues dividing labor and

8   management."  554 U.S. at 68 (quoting *Linn v. United Plant Guard Workers of Am.,*

9   *Local 114*, 383 U.S. 53, 62 (1966)).[9]  That is, the NLRA protects the rights of employers

10  and employees to engage in open debate about labor disputes.  *Id.*  Such speech is the

11  type of speech that Congress intended to leave unregulated.  It goes too far to say that

12  Congress intended to leave unregulated a third party's speech to the general public and

13  government agencies.  *See Building & Constr. Trades Council v. Associated Builders &*

14  *Contractors of Mass./R.I., Inc.*, 507 U.S. 218, 224 (1993) (explaining that, in the absence

15  of clear congressional intent, a court should be "reluctant to infer preemption").

16  Plaintiffs point to no cases extending the interpretation of section 8(c) that far, and the

17  Court's survey of applicable precedent has found none.

18        SB 954 is distinct from the preempted statute in *Brown*.  The statute in *Brown*

19  prohibited employers receiving state funds from using such funds to assist, promote, or

20  deter union organizing, but then exempted certain activities that promoted unionization.

21  Unlike the statute in *Brown*, SB 954 does not prevent employers or employees from

22  speaking about any issue.  And it expresses no preference about what type of speech is

23

24  _____

25  [9] In *Linn*, after stating that the enactment of section 8(c) represented congressional intent
    to "encourage free debate," the Supreme Court limited this finding in a footnote.  The

26  Court explained that "[i]t is more likely that Congress adopted this section for a narrower
    purpose, i.e., to prevent the Board from attributing antiunion motive to an employer on

27  the basis of his past statements."  383 U.S. at 62 n.5.  This more narrow interpretation of
    congressional intent further contradicts Plaintiffs' broad application of *Brown*.

28

allowed or prohibited.  The statute certainly does not regulate the mechanics of collective bargaining.

SB 954 also does not impose the same type of burdens on employers that the Court found offensive in *Brown*.  The statute in *Brown* established a "formidable" enforcement scheme, "making it exceeding difficult for employers to demonstrate that they have not used state funds," "imposed punitive sanctions for noncompliance," and permitted suit by the state attorney general and private taxpayers. *See id.* at 71-72.  This enforcement mechanism "put[] considerable pressure on an employer either to forgo his 'free speech right to communicate his views to his employees,' or else to refuse the receipt of state funds." *Id.* at 73.  "In so doing, the statute impermissibly 'predicat[ed] benefits on refraining from conduct protected by federal labor law.'" *Id.*  In contrast, SB 954 does not establish compliance burdens or litigation risks that pressure Plaintiffs to forgo their speech rights in exchange for the receipt of state funds.  It seems quite simple to comply with the law:  Effective January 1, 2017, an employer will not be able to credit industry advancement fund fees when calculating the prevailing wage for their workers, unless the employer is required by a CBA to pay them.  The statute does not condition the receipt of state funds on employers sacrificing their free speech rights.  Plaintiffs remain free to speak.

SB 954 will have an indirect effect on speech, but *Brown* did not address how statutes that affect speech in a more remote way should be treated.  Neither party points to the existence of a case discussing a statute similar to SB 954—*i.e.*, one that does not directly regulate speech but affects speech.  And, as the Court has explained above, there are important distinctions between SB 954 and the statute preempted in *Brown*.  In the absence of clear congressional intent, the Court should be "reluctant to infer preemption." *Building & Constr. Trades Council v. Associated Builders & Contractors of Mass./R.I., Inc.*, 507 U.S. 218, 224 (1993) ("The NLRA contains no express preemption provision. Therefore, in accordance with settled preemption principles, we should find [the statute] preempted unless it conflicts with federal law or would frustrate the federal scheme, or

1   unless we discern from the totality of the circumstances that Congress sought to occupy
2   the field to the exclusion of the States.  We are reluctant to infer preemption.").

3          *Bragdon* is similarly unhelpful for Plaintiffs.  Plaintiffs ignore that the Ninth
4   Circuit has retreated from its holding in *Bragdon*, cautioning that it "must be interpreted
5   in the context of Supreme Court authority and . . . other, more recent, rulings on NLRA
6   preemption."  *Associated Builders & Contractors of S. Cal., Inc. v. Nunn*, 356 F.3d 979,
7   990 (9th Cir. 2004).  In *Nunn*, the Ninth Circuit limited *Bragdon* to "extreme situations,
8   when [substantive labor standards] are 'so restrictive as to virtually dictate the results' of
9   collective bargaining."  *Id.*  The Ninth Circuit also effectively reversed *Bragdon* to the
10  extent the opinion was based on a concern that the ordinance targeted particular workers.
11  *Id.*  The court explained that "[i]t is now clear in this Circuit that state substantive labor
12  standards, including minimum wages, are not invalidated simply because they apply to
13  particular trades, professions, or job classifications rather than to the entire labor market."
14  *Id.*

15         This case is not such an "extreme situation" where the terms of SB 954 "virtually
16  dictate the results of collective bargaining."  In *Bragdon*, Contra Costa County went
17  beyond the exercise of its traditional police power in setting minimum wage standards by
18  intruding on how private industry negotiates its labor agreements.  Here, SB 954 may
19  ultimately "alter[] the backdrop" of labor-management negotiations, but it does not
20  "intrude[] on the mechanics of collective bargaining."  *Am. Hotel & Lodging Assoc.*, 834
21  F.3d at 964-65.  Employers and employees will come to the bargaining table and no
22  employer, unionized or open shop, will be able to take prevailing wage credit under SB
23  954.  *See Fort Halifax*, 4832 U.S. at 21 (explaining that employers and employees come
24  to the bargaining table with rights under state law that form a "backdrop" for their
25  negotiations").  Only an employer that agrees with its employees in a collective
26  bargaining agreement to divert the workers' wages to an industry advancement fund may
27  take the credit.  Unionized employers that fail to reach an agreement with their workers
28  on this issue may not take the credit.  Thus, SB 954 sets a standard applicable to all

1   employers but provides an opt-out for employers that are obligated to make the payments

2   under collective bargaining agreements.  Under Ninth Circuit precedent, opt-out

3   provisions are not preempted, even if there is a "potential benefit or burden in [their]

4   application."  *Viceroy Gold*, 75 F.3d at 490.

5       When plaintiffs lack a cognizable legal theory, dismissal of their complaint is

6   appropriate.  *Fortuna Enters.*, 673 F. Supp. 2d at 1003.  Here, Plaintiffs have failed to

7   allege a cognizable legal theory.  They interpret *Brown* too broadly and ignore the import

8   of the minimum labor standards and opt-out cases.  *Machinists* preemption does not apply

9   to SB 954.  Rather, the statute constitutes a minimum labor standard with an opt-out for

10  employers required to pay industry advancement fund fees pursuant to collective

11  bargaining agreements.  Plaintiffs' claim based on *Machinists* preemption is

12  **DISMISSED.**

13      **2.  *Garmon* Preemption**

14      *Garmon* preemption "is intended to preclude state interference with the NLRB's

15  interpretation and active enforcement of the 'integrated scheme of regulation' established

16  by the NLRA."  *Brown*, 554 U.S. at 65.  "To this end, *Garmon* preemption forbids States

17  to 'regulate activity that the NLRA protects, prohibits, or arguably protects or prohibits.'"

18  *Id.* (internal citations omitted).  Specifically, a state statute is subject to *Garmon*

19  preemption when the statute's terms regulate matters within the scope of sections 7 or 8

20  of the NLRA.  *Fortuna Enters.*, 673 F. Supp. 2d at 1004.  Section 7 of the NLRA protects

21  the rights of employees in collective bargaining, including the right to strike, their right to

22  picket, and their right to join or not join a union.  *See* 29 U.S.C. § 157.  Section 8

23  regulates unfair labor practices, and generally prohibits employers and labor

24  organizations from interfering with employee rights that are protected under section 7 of

25  the Act.  *See id.* § 158.

26      In their complaint, Plaintiffs argue SB 954 is preempted under *Garmon* because it

27  "interferes with employer speech rights guaranteed under § 8(c) of the NLRA."  (Compl.

28  ¶ 22.)  However, Plaintiffs appear to have abandoned this particular argument.  They do

not raise *Garmon* preemption in their oppositions to Defendants' motions and, in their motion for a preliminary injunction, they set forth a different basis for *Garmon* preemption.  Plaintiffs' new *Garmon* preemption argument is that the "NLRB regulates payments to industry advancement funds" and therefore "the statute intrudes in an area reserved for the exclusive regulation by the NLRB."  (Pls. Mot. at 14.)

No matter which argument Plaintiffs promote, both fail.  As established above, SB 954 represents a minimum labor standard with an opt-out provision for employers subject to collective bargaining agreements and, as a "minimum employment standard and an opt-out provision, there is no *Garmon* preemption."  *Viceroy Gold*, 75 F.3d at 490 ("The establishment of a minimum labor standard does not impermissibly intrude upon the collective bargaining process.  The fact that the parties are free to devise their own arrangements through the collective bargaining process strengthens the case that the statute works no intrusion on collective bargaining.").  The statute places no substantive restrictions on the terms of collective bargaining agreements and does not regulate or preclude speech about unionization or labor issues.  Plaintiffs' cases about industry advancement funds are inapposite—those cases do *not* stand for the proposition that the NLRB actually regulates industry advancement funds or payments to them.  Therefore, Plaintiffs fail to allege a cognizable legal theory that SB 954 is subject to *Garmon* preemption.  Plaintiffs' claim on this ground is **DISMISSED.**

### B. First Amendment

The foundational question that the Court must answer is whether ABC-CCC has pled a plausible claim that SB 954 impinges on the exercise of its First Amendment rights.  The Court concludes that ABC-CCC has not satisfied the plausibility standard.

SB 954 operates as a state subsidy of speech.  Employers receiving public funds for construction projects are allowed to credit payment of industry advancement fund fees against the obligation to pay the prevailing wage if they are obligated by a collective bargaining agreement to pay those fees.  Thus, the Court's analysis is controlled by the Supreme Court's speech subsidy cases, particularly *Regan v. Taxation with*

19

*Representation*, 461 U.S. 540 (1983) and *Ysursa v. Pocatello Education Association*, 555 U.S. 353, 358-59 (2009).  In those cases, the Supreme Court explained that "although government may not place obstacles in the path of a person's exercise of freedom of speech," *Regan*, 461 U.S. at 549, nothing requires government "to assist others in funding the expression of particular ideas, including political ones," *Ysursa*, 555 U.S. at 358.  "[A] legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right, and thus is not subject to strict scrutiny."  *Regan*, 461 U.S. at 549.

ABC-CCC argues that SB 954 is an obstacle to speech because it burdens the ability of industry advancement associations with a pro-open shop perspective to fund their political activity.  (Opp'n to Becerra Mot. at 7; Compl. ¶ 26.)  The statute thus discriminates against certain speakers and viewpoints, and restricts speech based on speaker and viewpoint.  (Opp'n to Becerra Mot. at 7-8; Compl. ¶¶ 25, 27-28.)

ABC-CCC's argument fails for several reasons.  First, SB 954 "erects no barrier to speech."  *Wisc. Educ. Ass'n Council v. Walker*, 705 F.3d 640, 646 (7th Cir. 2013) (upholding state statute prohibiting payroll deductions for certain types of unions against First Amendment challenge).  Employers that cannot take advantage of the wage credit are not restricted from speaking, nor are the industry advancement funds that might receive fees from employers which cannot take the credit.  SB 954 says nothing about particular speakers or viewpoints.  It does not deny access to the state subsidy depending on who the speaker is or what he, she, or it might say.  The statute is thus facially neutral.

ABC-CCC predicates its claim of speaker and viewpoint discrimination on the assertion that it will receive less "funding for [its] pro-open shop speech activities." (Compl. ¶ 26.)  But that assertion is tenuous and speculative.  The complaint assumes that ABC-CCC will not receive any contributions from employers who are now precluded from prevailing wage credits and that the only industry advancement speakers that will receive contributions will be funds with a viewpoint contrary to ABC-CCC.  However, ABC-CCC speaks on many issues that benefit the construction industry as a whole.  (*See* Compl. ¶ 16.)  Open shop employers and employees can still contribute to their preferred

industry advancement organizations.  In fact, non-union employees may continue to independently contribute to ABC-CCC.  Moreover, as a result of the law, open shop employers can market that their employees bring home more wages than unionized employees, even though both open shop and closed shop employers will be paying the same prevailing wage.  The open shop employers might be able to hire better workers.  Consequently, with improved quality and performance, open shop employers might win more public works contracts and have more money to contribute to industry advancement funds like ABC-CCC.  Of course, this chain of events is also hypothetical, but the point is that the economic effects of the statute are unknown.  The statute is neutral and does not favor, target, or suppress any particular speaker or viewpoint.  "The mere fact that, in practice, [industry advancement funds receiving wage credits pursuant to a CBA] may express different viewpoints [than industry advancement funds not receiving the credits] does not render [SB 954] viewpoint discriminatory."  *Walker*, 705 F.3d at 648.

The only obstacle to speech set forth by ABC-CCC is the ability to fund its speech.  Thus, "the 'obstacle' to speech here is the cost of speaking, an obstacle the state itself has not created."  *Walker*, 705 F.3d at 646.  The Supreme Court has rejected such a burden as a basis to apply strict scrutiny:

> Although [ABC-CCC] does not have as much money as it wants, and thus cannot exercise its freedom of speech as much as it would like, the Constitution does not confer an entitlement to such funds as may be necessary to realize all the advantages of that freedom.

*Regan*, 461 U.S. at 550 (internal quotation marks omitted).  SB 954 does not erect affirmative burdens or requirements on speech.  Rather, the California Legislature has at most expressed a preference to continue to provide the subsidy for some groups, while refraining from doing so for others.  A legislature's "selection of particular entities or persons for entitlement to" government largesse is a "matter of policy and discretion," that it "can, of course, disallow . . . as it chooses."  *Id.* at 549.

"What [ABC-CCC is] left with, then, is an argument that [the Court] should look past [SB 954's] facial neutrality as to viewpoint and [speaker] identity, and conclude

1    nevertheless that the [statute's] real purpose is to suppress speech by" open shops.  *Bailey*

2    *v. Callaghan*, 715 F.3d 956, 960 (6th Cir. 2013) (holding that state statute prohibiting

3    payroll deductions for public school union dues did not violate First Amendment or

4    Equal Protection Clause).  ABC-CCC contends that the "legislative history reveals that

5    SB 954's true purpose is to facilitate closed-shop advocacy and discourage open-shop

6    advocacy." (Pls. Mot. at 18.)  ABC-CCC's arguments again fail.  To begin, "[i]t is a

7    familiar principle of constitutional law that this Court will not strike down an otherwise

8    constitutional statute on the basis of alleged illicit legislative motive."  *Bailey*, 715 F.3d

9    at 960 (refusing to "peer past" the text of statute "to infer some invidious legislative

10   intention").  That principle binds the Court here.  The Court has taken judicial notice of

11   the legislative history and finds it implausible that the Legislature had such an illicit

12   purpose.  Rather, the legislative history reveals that the Legislature was concerned about

13   employers "credit[ing industry advancement fund] payments towards their prevailing

14   wage obligation without the input or consent of the employees or their labor

15   representatives." (Becerra Mot., Goldstein Decl., Ex. B.)  That SB 954 *might* have the

16   effect of burdening open-shop advocacy "does not transform its facially neutral language

17   into an invidiously discriminatory statute."  *Walker*, 705 F.3d at 651.  Similarly, the fact

18   that SB 954 was sponsored by the Building Trades Council, a pro-union group, "reveals

19   little of the intent of the legislature as a whole when it enacted" the statute.  *Id.* at 652.

20   Thus, because the statute does not interfere with a fundamental right or proceed

21   along suspect lines, it is subject to rational basis review.  *Regan*, 4651 U.S. at 547-48;

22   *Fortuna Enters.*, 673 F. Supp. 2d at 1013.  Under this standard, a law is upheld as long as

23   it bears a rational relationship to a legitimate government interest.  *Heller v. Doe*, 509

24   U.S. 312, 320 (1993).  Rational basis review requires the Court to "determine whether

25   there is any reasonably conceivable state of facts that could provide a rational basis for

26   the classification."  *Id.*   "A legislative choice is not subject to courtroom factfinding and

27   may be based on rational speculation unsupported by evidence or empirical data."  *Id.*

28

1         Here, it is clear that there is a rational basis for SB 954.  The Legislature was

2   concerned that workers' wages were being reduced without their consent.  The State has

3   a legitimate interest in ensuring that workers are paid the amounts they are owed.  The

4   statute now protects individual workers from being underpaid in this manner.  The law's

5   exception for "workers party to a collective bargaining agreement could rationally arise

6   from the expectation that unionized workers are better able to protect their interests with

7   regard to wages than non-unionized workers." *Fortuna Enters.*, 673 F. Supp. 3d at 1014

8   (citing *Viceroy Gold*, 75 F.3d at 490-91).  Therefore, SB 954 satisfies rational basis

9   review and the Court accordingly **DISMISSES** ABC-CCC's First Amendment claim.[10]

10  **III.   Preliminary Injunction**

11        Because Plaintiffs have not shown that they are likely to succeed on the merits, the

12  Court declines to issue a preliminary injunction.  *Winter*, 555 U.S. at 20.

13  / / /

14  / / /

15  / / /

16  / / /

17  / / /

18  / / /

19  / / /

20  _____

21

22  [10] ABC-CCC's equal protection claim relies on its contention that it has a fundamental

23  right to speak.  However, the Court finds that ABC-CCC has not pled a plausible claim
    that SB 954 interferes with the exercise of its First Amendment rights.  The Court

24  concludes that the statute satisfies rational basis review.  Therefore, ABC-CCC's equal
    protection claim also fails on the merits for the same reasons discussed in the text.  *See,*

25  *e.g.*, *Armour v. City of Indianapolis*, 132 S. Ct. 2073, 2080 (2012) ("As long as the City's
    distinction has a rational basis, that distinction does not violate the Equal Protection

26  Clause.  This Court has long held that 'a classification neither involving fundamental

27  rights nor proceeding along suspect lines . . . cannot run afoul of the Equal Protection
    Clause if there is a rational relationship between the disparity of treatment and some

28  legitimate government purpose.'").

1

**CONCLUSION**

2          The Court **DISMISSES** all three claims for relief and **GRANTS** Becerra's motion

3   to dismiss (ECF No. 6), Su's motion to dismiss (ECF No. 17), and Baker's motion for

4   judgment on the pleadings (ECF No. 17.)  The Court **DENIES** Plaintiffs' motion for a

5   preliminary injunction.  (ECF No. 11.)

6          **IT IS SO ORDERED.**

7   Dated:  January 27, 2017

8                                             Hon. Roger T. Benitez

9                                             United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28